# 96 DTA 134

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL SAN JUAN**

AUTORIDAD METROPOLITANA DE AUTOBUSES
Querellada-Recurrente

HERMANDAD DE EMPLEADOS DE OFICINA, COMERCIO Y RAMAS ANEXAS (H.E.O.)
Querellante-Recurrido

Núm. KLCE-96-00750

San Juan, Puerto Rico a 19 de septiembre de 1996

Panel integrado por su presidenta, Jueza Ramos de Buonomo
y los Jueces González Román y Córdova Arone

González Román, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Recurre la Autoridad Metropolitana de Autobuses (AMA) de una sentencia emitida por el Tribunal de Primera Instancia, Sala de San Juan el 20 de junio de 1996, archivada en autos copia de la notificación el 1ro. de julio de 1996 en la que se confirma una Resolución Supletoria del laudo de arbitraje emitido en el caso A-2582 sobre Eliminación de Clasificación de Despachador, Cesantías y Reubicaciones.

Los hechos que dan margen al presente recurso se remontan al 1ro. de mayo de 1987, fecha en la cual la AMA y la Hermandad de Empleados de Oficina, Comercio y Ramas Anejas de la Autoridad Metropolitana de Autobuses *("Unión")* suscribieron un convenio colectivo para regular las relaciones obrero-patronales entre los miembros de la Unión (empleados de la AMA) y la AMA. Este convenio, concede jurisdicción exclusiva a la Junta Juzgadora (la Junta), organismo creado en su Artículo XXVIII. La Junta está compuesta por tres miembros a ser designados como sigue: un miembro nombrado por la Autoridad, otro por la Hermandad y el otro será nombrado por el Hon. Secretario del Trabajo de Puerto Rico. Dispone además el convenio que la Junta tendrá jurisdicción exclusiva para entender en los casos de acción disciplinaria o despidos decretados por la Autoridad.

El convenio se mantuvo en vigor desde el 1ro. de mayo de 1987 hasta el día 21 de marzo de 1994, fecha en que entró a regir un nuevo convenio colectivo.

Durante el mes de marzo de 1992 la AMA eliminó de forma unilateral la clasificación de despachador. Por tal motivo, treinta y cinco (35) empleados fueron cesanteados y/o reubicados de sus puestos, siguiendo el procedimiento de desplazamiento por antigüedad.

La Unión dió por iniciados los procesos de arbitraje.

Por no estar de acuerdo con la decisión administrativa tomada por la AMA, la Unión sometió una querella ante la Junta para que, conforme al convenio colectivo vigente al momento del despido,

resolviera las controversias surgidas por la eliminación del puesto de despachador y otorgara un remedio adecuado a los obreros cesanteados y/o reubicados.

El árbitro resolvió a favor de la Unión. Luego de presentada la prueba de ambas partes, el árbitro Pedro Santos encontró que la AMA había violentado los artículos II y IV del convenio colectivo al eliminar unilateralmente la clasificación de despachador y al cesantear y/o reubicar personal como consecuencia de ello. El laudo, emitido el 28 de julio de 1994, ordenó la celebración de una reunión entre la AMA y la Unión para que negociasen un remedio adecuado a las referidas violaciones. Dispuso, además, que de no lograr acuerdo alguno dentro de un período razonable, la Junta ordenaría el remedio adecuado.

Las partes no pudieron llegar al acuerdo que pusiera fin a la controversia, por lo que la Junta determinó la solución a la que habrían de atenerse las partes. Al no poderse poner de acuerdo, las partes sometieron una estipulación a la Junta solicitando nuevamente la intervención del quinto miembro, el árbitro Pedro Santos. Atendida tal solicitud, la Junta emitió una Resolución Supletoria el día 11 de agosto de 1995 en la cual determinó que el remedio adecuado consistía en reestablecer la clasificación de Despachador a la unidad apropiada y reinstalar a los empleados cesanteados y/o reubicados a los puestos que ocupaban originalmente, con todos los haberes dejados de percibir desde el momento en que fueron cesanteados y/o reubicados. Concluyó su determinación ordenando el remedio con la frase, *"tal como lo solicita la Unión"*. Condenó, además, a la AMA, a satisfacer al abogado de la Unión por concepto de honorarios el 15% de los salarios dejados de percibir por los trabajadores afectados.

El tribunal recurrido denegó la solicitud para revisar el laudo. Estando la AMA en desacuerdo con el remedio concedido, solicitó intervención del tribunal recurrido para impugnar la determinación tomada. Finalmente, el 20 de junio de 1996, dicho tribunal denegó el recurso solicitado, manteniendo en todo vigor el laudo y la Resolución Supletoria objeto de revisión en el presente recurso.

Inconforme con el referido dictamen, la AMA instó el presente recurso de *Certiorari* en el que solicita se deje sin efecto exclusivamente aquella parte del laudo que otorga el pago de beneficios dejados de devengar a los empleados cesanteados y/o reubicados y se emita un pronunciamiento que proceda en derecho. En apoyo a su petición la AMA hace los siguientes señalamientos de error: En primer lugar, que el Tribunal recurrido incidió al confirmar una Resolución Supletoria que emitió la Junta toda vez que la frase: *"Tal como lo solicita la Unión"*, constituye una violación a la política pública establecida en el Gobierno del Estado Libre Asociado y sus dependencias con relación a la orden de pago de salarios y beneficios. En segundo lugar, que erró el Tribunal de Instancia al confirmar una Resolución Supletoria en la que la Junta excedió su jurisdicción al pretender un remedio al que no tienen derecho los querellantes. El tercer y último señalamiento indica como error revocable el confirmar una Resolución Supletoria en la cual la Junta tenía que emitir un remedio conforme a derecho, según la estipulación que le otorga jurisdicción. Señala que aquella parte del laudo que contenga errores de derecho debe de ser dejada sin efecto por los tribunales. Los errores señalados al Tribunal de Primera Instancia son, realmente, errores que se imputan a la Junta.

El 7 de agosto de 1996, la Unión presentó su oposición a la expedición del auto de *Certiorari*. En su escrito alega, en términos sucintos, que los asuntos planteados ante este tribunal fueron resueltos por el laudo arbitral, según disponía el convenio vigente al momento en que ocurrieron los hechos que dan margen a la presente controversia. Señaló además, que la decisión contenida en el laudo es final, firme y obligatoria para las partes en todas las cuestiones de hecho y derecho.

Contando con las comparecencias de ambas partes y estando en posición de resolver, procedemos a expedir el recurso y confirmar la sentencia recurrida.

Considerada la totalidad del expediente y los asuntos que han sido objeto de amplia litigación, procedemos a hacer los pronunciamientos correspondientes en cuanto a nuestro estado de derecho y los méritos del recurso.

El arbitraje obrero-patronal en Puerto Rico no está reglamentado estatutariamente. Los principios legales que lo rigen han sido elaborados jurisprudencialmente por el Honorable Tribunal Supremo de

Puerto Rico, a partir del caso *Ríos v. Puerto Rico Cement,* 66 D.P.R. 470 (1946). No obstante, la jurisprudencia normativa donde se han impartido los principios fundamentales del arbitraje obrero-patronal es indudablemente el caso *J.R.T. v. NY & PR S/S Co.,* 69 D.P.R. 782 (1949). El mismo dispuso que un laudo arbitral no es ni un contrato ni una sentencia pero disfruta de la naturaleza de ambos. Por consiguiente, los motivos por los cuales un laudo, basado en una sumisión voluntaria, puede ser impugnado se reducen a (1) fraude, (2) conducta impropia, (3) falta de debido procedimiento en la celebración de la vista, (4) violación a la política pública, (5) falta de jurisdicción, y (6) que el laudo no resuelva todas las cuestiones en controversia que se sometieron. ■

El Tribunal Supremo de Puerto Rico ha observado que la experiencia en nuestra jurisdicción en las últimas décadas ha demostrado que el arbitraje es un valioso mecanismo que tiende a mantener la estabilidad y la paz industrial, que son precisamente propósitos cardinales que persiguen nuestras leyes laborales. Véase, *S.I.U. de Puerto Rico v. Otis Elevator Co.,* 105 D.P.R. 832, 836 (1977). Además, se considera un trámite ideal para resolver disputas obrero-patronales de modo rápido, cómodo, menos costoso y técnico. Véase, *J.R.T. v. Hato Rey Psychiatric Hospital,* 119 D.P.R. 62, 68 (1987); *S.I.U. de Puerto Rico v. Otis Elevator Co., supra.* Particularmente, se favorece este mecanismo porque ayuda a sostener y proporcionar la estabilidad para lograr los propósitos fundamentales de la negociación colectiva. *J.R.T. v. Junta Administrativa del Muelle Municipal de Ponce,* 122 D.P.R. 318, 330 (1988).

Los procedimientos de arbitraje y laudos emitidos en el campo laboral disfrutan de gran deferencia por parte de los tribunales. *J.R.T. v. Junta Administrativa del Muelle Municipal de Ponce, supra.* Las determinaciones de hechos de los árbitros al igual que la de los tribunales inferiores merecen deferencia, y deben sostenerse en ausencia de error manifiesto, prejuicio o parcialidad, *Rodríguez v. López Jiménez,* 116 D.P.R. 175 (1984), siempre y cuando las mismas representen el balance más racional, justiciero y jurídico de la prueba.

Cuando las partes suscriben un convenio colectivo en donde acuerdan someter sus disputas obrero-patronales a un procedimiento de arbitraje deben comprender que han sustituido el criterio del árbitro por el de la corte. Véase, *Unión General de Trabajadores v. Challenger Caribbean,* ___ D.P.R.___, **90 J.T.S. 43**. En *National Railroad Passenger Corporation v. Boston and Maine Corporation,* 850 F.2d 756, 759 (1988) quedó resuelto que cuando las partes han provisto que un tipo particular de disputa debe resolverse mediante arbitraje, en lugar de una litigación judicial, un tribunal no vulnerará dicho acuerdo decidiendo por sí mismo la disputa. Esta normativa jurídica fue incorporada a nuestro acervo doctrinal en *U.C.P.R. v. Triangle Engineering Corp.,* 137 D.P.R. ___ (1994), **94 J.T.S. 72**. Hacerlo conllevaría menoscabar la raíz misma del poder del árbitro bajo un acuerdo que tiene fuerza de ley entre las partes contratantes y relegar a un segundo plano la política pública de promover el arbitraje como método para solucionar disputas. En consecuencia, como regla general, el foro judicial no está accesible para que se reproduzcan y diluciden las controversias adjudicadas en un laudo. *S.I.U. de Puerto Rico v. Otis Elevator Corp., supra.*

Los tres señalamientos de error que hace la recurrente son improcedentes. Por estar íntimamente relacionados los errores planteados, habremos de discutirlos conjuntamente. Preocupa a la AMA el significado de la parte de la Resolución Supletoria emitida por la Junta el 11 de agosto de 1995 que ordena al patrono la inclusión inmediata de la clasificación de Despachador en la Unidad Apropiada y la reposición de los empleados casenteados y/o reubicados a los puestos que ocupaban como Despachadores con todos los haberes dejados de pecibir desde el momento de las cesantías o reubicaciones, **tal como lo solicita la unión.** Como muy bien señala la Hermandad en su bien fundamentado escrito de oposición al recurso, entendemos que la Resolución es clara y diáfana y no hay nada que aclarar. El patrono pagará a los empleados ilegalmente cesanteados o reubicados las cantidades correspondientes a los haberes y beneficios que cada uno de los trabajadores afectados por el laudo hubiera recibido de no haber sido por la acción ilegal del patrono al eliminar unilateralmente la clasificación de despachador. Al momento de la Hermandad solicitar la reposición de los empleados cesanteados o reubicados a los puestos que ocupaban así como el pago de los haberes dejados de percibir, proveyó un listado de los querellantes y el cómputo de las cantidades que deberían recibir por concepto de los haberes dejados de percibir. La AMA no cuestionó las cantidades allí consignadas sino algunos conceptos reclamados por la unión. Tampoco presentó un desglose durante las negociaciones ordenadas en el laudo.

*"The use of the more (sic) term "full compensation for time lost may reasonably be viewed as indicating an intent that the employee be awarded whatever back pay would compensate him for time unjustly lost from work. In the absence of language showing a clear intent to deny the arbitrator latitude of judgment, the court declared that it is for the arbitrator to answer this question."* ▪

Correspondía al árbitro proveer los remedios concedidos.

Argumenta, además, la AMA que el árbitro concedió remedios que no tienen derecho los querellantes. No le asiste la razón. La reclamación de los despachadores cuyas plazas fueron eliminadas por la AMA no están reclamando paga por el período de tomar alimentos en sus plazas de conductor de camión, sino por el período de tomar alimentos en su plaza de despachador, que según negociado en el convenio colectivo hubiese devengado de no haber sido eliminado ilegalmente el puesto de despachador. No debe perder de vista la AMA que al presentar su sumisión al procedimiento de arbitraje su versión fue la siguiente:

*"Determinar si los querellantes trabajaron las horas de alimentos que reclaman y de determinarlo así, el árbitro, conforme a derecho, emita el remedio que estime adecuado."*

El árbitro hace constar en el laudo y así se pudo constatar de la copia del mismo, incluida en el Apéndice del recurso, que el convenio colectivo no establece el horario de tomar alimentos para aquellos empleados que como el querellante tenían un horario irregular y que estaban clasificados como empleados operacionales. Para cubrir esa laguna y cónsono con lo establecido en la sumisión de las partes, el árbitro se refiere al Artículo 14 de la Ley 379 que en lo pertinente establece: *"Todo patrono que emplee o permita que un empleado trabaje durante el período destinado para tomar alimentos vendrá obligado a pagarle por dicho período o fracción del mismo un tipo de salario igual al doble del tipo convenido para las horas regulares"*. Toda vez que la AMA pagó a tipo sencillo, no compensó como establece la ley y procede lo dispuesto por el árbitro.

Precisa establecer que en el caso de autos las partes habían acordado que por necesidad del servicio los empleados querellantes trabajarían su período de tomar alimentos y de merienda (media hora de tomar alimentos y veinte minutos de merienda), lo que obliga al patrono a pagar lo que estos hubiesen devengado de no haber sido por las cesantías. Los empleados trabajaban los días feriados según el convenio colectivo. No estaríamos en condiciones de afirmar que esas reclamaciones son especulativas.

En Puerto Rico la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 del 8 de mayo de 1945, 29 L.P.R.A., 61 *et seq.,* constituye el estatuto al amparo del cual los trabajadores de las corporaciones e instrumentalidades públicas ejercen el derecho a organizarse colectivamente y a negociar convenios colectivos que les reconoce la sección 17 y 18 del artículo II de la Constitución del Estado Libre Asociado de Puerto Rico. En virtud de su artículo 1, dicho estatuto consigna la política pública laboral de Puerto Rico respecto a los convenios colectivos. El inciso número dos (2) del referido artículo establece que éstos (los convenios colectivos) son mecanismos adecuados *"para resolver pacíficamente controversias obrero-patronales"*. Además, su inciso cinco (5) determina que dichos convenios constituyen ser los instrumentos adecuados para promover la política pública del Estado Libre Asociado de Puerto Rico y cuando las partes pactan someter sus disputas a un proceso de arbitraje, lo hacen en el ejercicio de la política gubernamental antes mencionada.

La tendencia moderna en el Derecho Laboral es la de concederle amplia autoridad al árbitro para diseñar un remedio adecuado a su laudo, *J.R.T. v. National Packing,* 112 D.P.R. 162 (1982), ampliando además el ámbito y alcance de éstos a aspectos tales como la fijación de doble penalidad, honorarios de abogado, intereses legales, daños y perjuicios y costas de litigación. *Beauchamp v. Dorado Beach,* 98 D.P.R. 633 (1970); *Nazario v. Tribunal,* 98 D.P.R. 846 (1970); *J.R.T. v. Caribbean Towers,* 102 D.P.R. 774 (1974); *Colón v. A.A.A.,* 103 D.P.R. 135 (1974); *U.T.I.E.R. v. J.R.T.,* 99 D.P.R. 512 (1970); *Sonic Knitting Industries v. I.L.G.W.U.,* 106 D.P.R. 557 (1977).

Los laudos no pueden ser contrarios a la política antes enunciada. Cuando el Honorable Tribunal Supremo de Puerto Rico indica que la violación de la política pública constituye una causa de nulidad

de un laudo, significa que un laudo no puede contravenir las directrices establecidas en el artículo 1 de la Ley 130, *supra*, ni las disposiciones contenidas en la Constitución, las leyes laborales, ni lo dispuesto en los decretos mandatorios. Los estatutos laborales persiguen el objetivo de garantizar los derechos del obrero frente a su patrono. Ciertamente, la frase *"tal como lo solicita la unión"* no es contraria a la política pública antes enunciada; meramente es indicativa de que el remedio solicitado por la Unión era el procedente y tal como lo solicitó, se concedió. Por consiguiente resolvemos que no se cometió el error señalado.

En sus últimos dos señalamientos de error, la recurrente alega que la Junta se excedió en su jurisdicción al emitir un remedio al cual, según entiende la AMA, no tenían derecho los recurridos toda vez que la estipulación de las partes que le otorgaba jurisdicción señalaba que el fallo tenía que emitirse conforme a derecho. Estos errores tampoco se cometieron. El convenio colectivo vigente al momento de los despidos y del cual emana el proceso ante el tribunal recurrido no requiere que las controversias entre las partes sean resueltas conforme a derecho. Por su parte, la recurrente señala que el convenio, al momento de firmarse la Estipulación, requería que las decisiones tendrían que emitirse conforme a derecho. Esa última interpretación es incorrecta, el convenio que aplica es el vigente al ocurrir los hechos que motivan este caso. No erró el tribunal al confirmar la determinación de la Junta.

Reiteradamente se ha resuelto en nuestra jurisdicción que cuando no se pacta expresamente que el laudo tiene que ser emitido conforme a derecho, el mismo no tendrá semejante limitación. ▐En el caso ante nuestra consideración no están presentes las causas de nulidad que reconoce nuestro Tribunal Supremo en *J.R.T. v. NY & PR S/S Co.*, *supra*, y que mencionamos previamente.

En resumen, en el caso de autos, donde el convenio colectivo no exige que la Junta emita su laudo conforme a derecho y donde las partes han consentido sustituir a los tribunales por el criterio del árbitro, la función de los tribunales se limita meramente a determinar si existe o no una causal de nulidad que invalide el mismo. En cuanto a este aspecto, consideramos adecuadas las palabras de nuestro Tribunal Supremo en *U.I.L. de Ponce v. Destilería Serrallés, Inc.*, 116 D.P.R. 348, 353-54 (1985).

*"...debemos recordar que en relación a aquellos laudos de arbitraje que no tienen que ser emitidos conforme a derecho, la trayectoria y tendencia de nuestras decisiones respecto a la revisión de dichos laudos por parte del foro judicial ha sido una clara y constante: una de autorrestricción o abstención judicial [citas omitidas], de una especial deferencia hacia los mismos por razón de que éstos constituyen el trámite ideal para resolver disputas obrero-patronales de modo rápido, cómodo y menos costoso."* [Cita omitida].

*"Indicativo de lo antes expresado es el hecho de que hemos resuelto no intervenir con el laudo emitido aun cuando quizás hubiéramos (el tribunal) llegado a una conclusión distinta si la cuestión estuviera sometida ante nosotros, [cita omitida], y que las partes que firman un convenio de esta naturaleza deben comprender que han sustituido al árbitro por las cortes [cita omitida]."*

El convenio colectivo determina la situación jurídica de los contratantes ante la emisión de un laudo. El convenio dispuso en su artículo XXVIII que el fallo o decisión de la Junta sería final, firme y obligatorio para las partes en todas sus cuestiones de hecho y derecho. La importancia de ello estriba en que las partes tenían la libre opción de escoger el trámite mediante el cual resolverían las disputas que surgieran de las relaciones obrero-patronales. Las partes contratantes no tenían necesariamente que acogerse al mecanismo de arbitraje para dilucidar sus controversias, sino que podían libremente elegir uno distinto. Sin embargo, al pactar el arbitraje como alternativa, la recurrente no puede evadir las consecuencias que producen sus actos.

Por los fundamentos antes enunciados, se expide el recurso y se confirma la sentencia recurrida.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

Lcda. Aida Ileana Oquendo Graulau
Secretaria General

**1.** El convenio dispone que el fallo o decisión de la Junta será final, firme y obligatorio para las partes en todas las cuestiones de hecho y derecho. (Véase página 84 del apéndice escrito de petición).

**2.** En los casos en que el laudo no tenga que emitirse conforme a derecho.

**3.** Hill & Sinicropi, *Remedies in Arbitration,* 2d Ed. pág. 31, 1981, The Bureau of National Affairs, Washington, 1991.

**4.** Nuestra jurisprudencia establece claramente que *"no es revisable en su fondo el error de los árbitros en la apreciación de los hechos o en las normas de un derecho, independientemente del sentir concurrente o disidente del foro judicial...; no son revisables tampoco señalamientos de errores que conllevan considerar en sus méritos cuestiones de hecho sobre la interpretación de un contrato y la prueba recibida por los árbitros." Febus v. Marpe Construction,* 136 D.P.R. \_\_\_, **94 J.T.S. 19**.